UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
FRANCES GARCIA, o/b/o, R.G., *pro se*,          :
                                                :
                              Plaintiff,        :
                                                :        **MEMORANDUM AND ORDER**
              -against-                         :              12-CV-4966
                                                :
                                                :
CAROLYN W. COLVIN,                              :
Commissioner of Social Security,               :
                                                :
                              Defendant.        :
----------------------------------------------------------------x
**DORA L. IRIZARRY, United States District Judge:**

On March 31, 2009, plaintiff Frances Garcia, *pro se*,[1] filed an application for

supplemental security income ("SSI") under the Social Security Act (the "Act"), on behalf of her

minor daughter, R.G., alleging that R.G. suffered from a learning disability. (R. 136-42, 203.)[2]

On June 12, 2009, the Social Security Administration denied plaintiff's application and plaintiff

requested a hearing before an administrative law judge ("ALJ"). (R. 71-76.) On December 14,

2010, ALJ Timothy C. Pace conducted a hearing, at which plaintiff and R.G. were represented

by counsel. (R. 48-70.) On February 3, 2011, the ALJ issued a decision concluding that R.G.

was not disabled within the meaning of the Act. (R. 29-45.) On August 3, 2012, the ALJ's

decision became the Commissioner's final decision when the Appeals Council denied plaintiff's

request for review. (R. 1-5.) Plaintiff timely filed the instant action seeking judicial review of

the denial of benefits. (*See generally* Complaint, Dkt. Entry No. 1.) The Commissioner moves

---

[1]     *Pro se* pleadings are held "to less stringent standards than formal pleadings drafted by lawyers." *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (citation omitted). Courts should "interpret [such papers] to raise the strongest arguments that they suggest." *Forsyth v. Fed'n Emp't & Guidance Serv.*, 409 F. 3d 565, 569 (2d Cir. 2005) (citation and quotation marks omitted). Though a court need not act as an advocate for *pro se* litigants, in such cases there is a "greater burden and a correlative greater responsibility upon the district court to insure that constitutional deprivations are redressed and that justice is done." *Davis v. Kelly*, 160 F. 3d 917, 922 (2d Cir. 1998) (citation omitted).

[2]     "R." refers to pages from the administrative transcript.

for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, seeking affirmation of the denial of benefits (*see* Memorandum of Law in Support of Commissioner's Motion for Judgment on the Pleadings ("Comm'r's Mem."), Dkt. Entry No. 15), which plaintiff opposes (*see* Plaintiff's Opposition to Comm'r's Mem. ("Pl. Opp'n"), Dkt. Entry No. 16). For the reasons set forth below, the Commissioner's motion is granted and this action is dismissed in its entirety.

## BACKGROUND

### I. Testimonial and Self-Reported Evidence

On March 31, 2009, Plaintiff filed an application for SSI disability benefits for R.G. for an unspecified learning disability. (R. 136-42, 203.) In a disability report dated April 3, 2009, Plaintiff reported that R.G. had not received any treatment for illnesses, injuries, or conditions. (R. 207.) In a function report dated April 3, 2009, Plaintiff reported that R.G. had no problems seeing, hearing or talking. (R. 213-22.) Plaintiff indicated that R.G. could not repeat stories, tell jokes or riddles accurately, or explain why she did something, or use sentences that started with "because," "what if," or "should have been." (R. 216.) She noted that R.G. had the ability to read, but could not read capital letters or small letters, could not read or understand simple sentences, and could not read or understand stories in books or magazines. (R. 217.) R.G. had the ability to write small words, but could not write a simple six or seven sentence story. (*Id.*) She could add and subtract numbers over ten. (*Id.*) But, R.G. did not know the days of the week or months of the year, and could not make change or tell time. (*Id.*)

At the December 14, 2010 hearing, Plaintiff appeared with counsel and testified before the ALJ. Plaintiff testified that R.G. was in the fifth grade but functioned at a third grade level. (R. 52-53.) R.G. could read, but could not remember what she had read. (R. 53.) Plaintiff

conceded that R.G. was well-behaved at school, but testified that R.G. was overactive at home and bothered her sister. (R. 63.) R.G. started taking medication prescribed by a psychiatrist in February, which made her less depressed and more hyperactive. (R. 64, 66.) R.G. had trouble following directions. (R. 54-55. 57, 63.) At the time of the hearing, R.G. took Risperdal, Wellbutrin, and fish oil. (R. 55-56.) Recently, R.G. struggled with a hearing test, and the test showed trouble with respect to hearing in one ear. (R. 56.)

R.G., too, testified at the hearing. She stated that she could read a street sign. (R. 53.) She demonstrated that she could read a clock, make change, and that there were seven days in a week. (R. 53-54.) She did not know how many months were in a year. (R. 54.) She denied experiencing any problems at school. (R. 58.) She enjoyed singing, playing soccer with her friends, playing video games, and riding her bicycle. (R. 58-59.) She stated that she had not gotten into any fights with other students at schools and was able to take turns when required. She denied getting into any fights with other students and reported that she was respectful of her teachers. (R. 59-60.) She acknowledged that she "sometimes" did not listen to her mother and that during disagreements with her mother, R.G. "sometimes" stomped on the floor or slammed the doors. (R. 60.)

## II.     School Records

### A.     10th & Penn

R.G. began her education at the 10th and Penn Elementary School in Reading, Pennsylvania ("10th & Penn"). (R. 257.) An interim report dated September 29, 2008 indicates that R.G. had poor grades in reading and mathematics. (*Id*.) In a letter dated October 10, 2008, Dara Miller, R.G.'s third grade teacher, indicated that R.G. was a "sweet child" who should be

tested for special education.  (R. 256.)  On October 10, 2008, R.G. withdrew from 10th & Penn. (R. 231.)

Subsequently, on April 30, 2009, Ms. Miller completed a Teacher Questionnaire in connection with R.G.'s application for SSI, summarizing her observations of R.G.'s abilities.  (R. 223-30.)  Under the Acquiring and Using Information category, Ms. Miller scored R.G. as having a "serious problem" in each skill assessed.  (R. 224.)  She specified that R.G. "needs extreme amounts of re-focusing help" and that she exerts "little effort in focusing [and] trying." (*Id*.)  With respect to the skills assessed under the Attending and Completing Tasks category, Ms. Miller gave R.G. mixed scores, ranging from skills for which R.G. had "no problem" completing to skills for which R.G. had a "serious problem" completing.  (R. 225.)  She noted that R.G. needed help focusing and pacing herself, which seemed like "an unlearned responsibility problem mostly.  She wasn't taught to be responsible or focus."  (*Id*.)  Finally, Ms. Miller stated that she did not know of any limitations with respect to R.G.'s "Health and Physical Well-Being."  (R. 229.)

### B.    Antietam School District

After leaving 10th & Penn during the middle of third grade, R.G. enrolled in an elementary school within the Antietam School District ("Antietam").  On February 10, 2009, Antietam completed an Evaluation Report ("ER") of R.G. at a parent's request.[3]  (R.160-73.)  At the time the ER was prepared, R.G. had attended class in Antietam for approximately one month after transferring from 10th & Penn.  (R. 160.)  The ER indicated that R.G.'s current grades were a "D" in math, and "F" in reading, and a "D" in writing.  (R. 160, 170.)  She completed most homework, but failed to complete long-term projects in a timely manner.  (R. 160, 171.)  She often needed directions repeated or explained differently.  (R. 160, 166, 178.)  Her teacher, Ms.

---

[3]    The Evaluation Report does not specify whether R.G.'s mother or father requested the evaluation.

Outland, indicated that R.G.'s behavior was fine, but that she could be mean to other students. (R. 160.) As a result, other students rarely asked her to play with them. (R. 160, 167, 171.) Although R.G.'s spelling had improved, she suffered from an "inadequate mastery of the current curriculum" and was "below grade level in math, writing, and reading." (R. 160, 171.) R.G. "usually [did] not master new concepts or skills taught." (*Id.*)

Ms. Outland recommended that R.G. receive extra explanation of assignments, extra one-on-one support, small group work, and preferential seating to limit distraction. (R. 161.) Ms. Outland also recommended that tests be read to R.G. (R. 161.)

The ER summarized other records which evaluated R.G.'s academic progress. The report card for second grade, which R.G. attended at 10th & Penn, indicated that R.G's: (1) Independent Reading Level was "Below Grade Level;" (2) her Reading Achievement, evaluated for different skills, varied between "Below Basic" and "Basic" levels; (3) her English was "Proficient; (4) her Written Communication was "Proficient; and (5) her Mathematics score averaged as "Basic," with her fourth quarter grade reflecting "Proficient" skills. (R. 161.) Her second quarter report card for third grade, which she attended in Antietam, indicated that she received the following grades (with the class average in parentheses): Library – 100 (100); Health – 76 (90); Reading – 52 (87); Writing – 72 (91); Social Studies – 72 (98); Math – 62 (82); and Physical Education – 93 (95). (R. 162.)

The ER also contains the results of cognitive tests conducted by Chris Stofko, a school psychologist. On January 23, 2009, Mr. Stofko administered a Wechsler Intelligence for Children – Fourth Edition ("WISC-IV") to R.G. (R. 166, 172.) The WISC-IV indicated that R.G. had an IQ of 99, which was in the average range and that she had average scores in verbal comprehension, perceptual reasoning, and processing speed. (R. 162-63.) She scored a 116 in

working memory, which was in the high average range.  (*Id.*)  On that same day, Mr. Stofko administered the Wechsler Individual Achievement Test – Second Edition ("WIST-II") to R.G. (R. 163-64, 166.)  She scored in the average range for reading, mathematics, written language, and listening comprehension.  (R. 170.)  Mr. Stofko reported that R.G. was "pleasant and talkative" during the testing.  (R. 167.)

The ER concludes that R.G.'s cognitive ability was average, but notes a discrepancy between her intellectual ability and her actual achievement.  (R. 167, 170.)  R.G. gave her best effort the majority of the time, had shown improvement during her tenure at Antietam, and was pleasant, energetic, and well-behaved.  (R. 167.)  She regularly completed homework on time. (*Id.*)  However, she had poor handwriting and struggled with reading comprehension.  (*Id.*)  The ER recommended specially designed instruction for R.G., including smaller student-teacher ratio, individualized pace of instruction, multiple cues to facilitate information acquisition and retrieval, as well as reading instruction within a special education program.  (R. 168.)  The ER also recommended instruction on study and time management skills as well as regular monitoring and support for R.G. at her regular education program.  (*Id.*)  The ER recommended a number of accommodations, including, *inter alia*, preferential seating, additional assistance with assignments, simplified directions, and extended time for assignments and tests.  (*Id.*)

On February 24, 2009, Antietam issued an Individualized Education Program Report ("IEP") for R.G.  (R. 174-96.)  The IEP recommended the following accommodations:  allowing portions of tests to be read aloud, multiple testing sessions, scheduled extended time, scheduled breaks, simplifying directions, small group testing, and testing in a separate room.  (R. 182.)  The IEP recommended that Antietam provide R.G. with special education support and services for two out of the six and one-half hours of her school day.  (R. 192, 194.)

On January 14, 2010, Antietam issued an IEP Revision, recommending that R.G. receive "writing instruction in the general education classroom with modifications and adaptations to the curriculum and the special education teacher to support [the teacher] in this setting." (R. 315.)

On February 24, 2010, Antietam issued R.G.'s annual IEP report. (R. 281-303.) With respect to academics, R.G. was reading at the beginning of third grade level and her listening comprehension was at a second grade level. (R. 284-85.) Her teacher, Suzanne Messner, noted that R.G.'s handwriting was "often neat" but could be "sloppy if she [did] not take her time." (R. 285.) Ms. Messner had no concern with R.G.'s gross motor skills and organization. (*Id.*) She noted that R.G. was "able to effectively express herself," got along well with other peers, and was "very kind and respectful of others['] feelings." (*Id.*) She demonstrated "age appropriate self-help and daily living skills." (*Id.*) The IEP report recommended that R.G. receive testing accommodations as well as specialized daily instruction. (R. 295.) Based on this report, R.G. received supplemental education support, spending four hours out of six and one-half hours of the school day in a regular education setting. (R. 297, 299, 308.)

A review of her report cards indicate that R.G. improved academically from 2008 to 2010. (R. 243-44, 255, 260, 262-63.) Indeed, she received mostly A's (with some B's) by the end of 2010. (R. 260, 262-63.)

## III.    Defendant's Case Examiners

On June 11, 2009, Junko McWilliams, Ph.D., a state agency review psychologist, reviewed the record accumulated thus far in this case and completed a childhood disability evaluation form for R.G. (R. 415-21.) Dr. McWilliams indicated that R.G.'s impairment was a "Learning Disorder, NOS [not otherwise specified]" of "Mild-Moderate" severity. (R. 416.) He indicated that this impairment was severe, but did not "meet, medically equal, or functionally

equal the listings." (*Id.*)  She opined that R.G. had a marked limitation in acquiring and using information; less than marked limitations in attending and completing tasks, and in caring for oneself, and no limitations in interacting and relating with others, moving about and manipulating object, and health and physical well-being.  (R. 418-19.)

## IV.    Biopsychological Evaluations

On January 14, 2010, Robert E. Slawinski, M.A., of Progressions Behavioral Health Rehabilitation Services, conducted a biopsychological re-evaluation of R.G.  (R. 275-80.)  Mr. Slawinski diagnosed R.G. with Attention Deficit Hyperactivity Disorder and Disruptive Behavior Disorder.  (R. 279.)  Mr. Slawinski recommended that R.G. continue to receive the services of a Mobile Therapist three hours per week to increase R.G.'s "frustration tolerance, impulse control and anger management skills."  (R. 280.)  He noted that the Mobile Therapist should also "help the parent to develop and implement a behavior plan which can improve compliance, increase the overall level of structure in the home and help her to use parenting strategies . . . ."  (*Id.*)  He recommended that R.G. see a psychiatrist to "determine the potential efficacy of using medication as part of her treatment."  (*Id.*)  He also recommended that the treatment team should meet monthly and should "provide and discuss a crisis de-escalation plan with the family."  (*Id.*)

On May 20, 2010, Mr. Slawinski conducted a comprehensive biopsychological re-evaluation of R.G.  (R. 268-74.)  He noted improvement in academics and that her interests were stable.  (R. 269.)  He reported that R.G. took Wellbutrin SR, 100 mg.  (R. 270.)  He reported that R.G. was cooperative and friendly, and that she appeared candid, thoughtful, and honest.  (R. 271.)  His diagnoses remained the same.  (R. 273.)  He opined that R.G.'s continued difficulties

warranted continued treatment in accordance with the recommendations contained in his prior evaluation. (R. 273-74.)

## DISCUSSION

I.      **Standard of Review**

This Court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In reviewing the Commissioner's decision, the Court need not determine de novo whether a claimant is disabled. *See Pratts v. Chater*, 94 F. 3d 34, 37 (2d Cir. 1996). Rather, the Court's inquiry is limited to the question of whether the Commissioner applied the correct legal standard in making the determination and, if so, whether such determination is supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *Shaw v. Chater*, 221 F. 3d 126, 131 (2d Cir. 2000); *Beauvoir v. Chater*, 104 F. 3d 1432, 1433 (2d Cir. 1997). "'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lamay v. Astrue*, 562 F. 3d 503, 507 (2d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"[T]o determine whether the findings are supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Brown v. Apfel*, 174 F. 3d 59, 62 (2d Cir. 1999) (quoting *Mongeur v. Heckler*, 722 F. 2d 1033, 1038 (2d Cir. 1983)). Moreover, "[e]ven when a claimant is represented by counsel, it is the well-established rule in our circuit 'that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits

proceeding.'" *Moran v. Astrue*, 569 F. 3d 108, 112-13 (2d Cir. 2009) (quoting *Lamay v. Comm'r of Soc. Sec*., 562 F. 3d 503, 508-09 (2d Cir. 2009)). Therefore, the court must be satisfied "that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the [Social Security] Act.'" *Id.* at 112 (quoting *Cruz v. Sullivan*, 912 F. 2d 8 (2d Cir. 1990)).

"If the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even where substantial evidence supporting the claimant's position also exists." *Hernandez v. Barnhart*, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (citing 42 U.S.C. § 405(g)). "The role of the reviewing court is therefore 'quite limited and substantial deference is to be afforded the Commissioner's decision.'" *Id.* (quoting *Burris v. Chater*, 1996 WL 148345, at *3 (S.D.N.Y. Apr. 2, 1996)).

## II.     Governing SSA Regulations for Defining Childhood Disability

To qualify for SSI benefits, a child under the age of eighteen must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i); *see also Pollard v. Halter*, 377 F. 3d 183, 189 (2d Cir. 2004). The SSA has provided a three-step sequential analysis to determine whether a child is eligible for SSI benefits on the basis of disability. 20 C.F.R. § 416.924(a); *see also Pollard*, 377 F. 3d at 189.

First, the ALJ must consider whether the child is engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). "Second, the ALJ considers whether the child has a 'medically determinable impairment that is severe,' which is defined as an impairment that causes 'more than minimal functional limitations.'" *Pollard*, 377 F. 3d at 189 (quoting 20

C.F.R. § 416.924(c)).  Third, "if the ALJ finds a severe impairment, he or she must then consider whether the impairment 'medically equals' or . . . 'functionally equals' a disability listed in the regulatory 'Listing of Impairments'" as set forth in 20 C.F.R. § Part 404, Subpart P, Appendix 1 (the "Listings").  *Id.* (quoting 20 C.F.R. § 416.924(c), (d)).  Under the third step, to demonstrate functional equivalence to a listed impairment, the child must exhibit "marked" limitations in two of six domains, or an "extreme" limitation in one domain.  20 C.F.R. § 416.926a(a).  These six domains consider a child's: (1) ability to acquire and use information; (2) ability to attend and complete tasks; (3) ability to interact and relate with others; (4) ability to move about and manipulate objects; (5) ability to care for oneself; and (6) health and physical well-being.  20 C.F.R. §§ 416.926a(a)-(b).  A "marked" limitation "interferes seriously with [the child's] ability to independently initiate, sustain, or complete activities." *Johnson v. Astrue*, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (quoting 20 C.F.R. § 416.926a(e)(2)(i)).  In addition, the regulations provide that a limitation is "marked" when standardized testing shows functioning two standard deviations below mean levels.  *Id.*; *see also Pacheco v. Barnhart*, 2004 WL 1345030, at *4 (E.D.N.Y. June 14, 2004).  An "extreme" limitation exists when the impairment "interferes very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i).  An "extreme" limitation would be found in a domain where the child scores at least three standard deviations below average.  *Id.*

### III.    Analysis

The ALJ reviewed the entire record and prepared a thorough and well-reasoned decision denying Plaintiff's application for benefits from R.G.  (R. 42.)  The ALJ noted that R.G., who was born on May 3, 2000, was a school age child on March 31, 2009, the date her application was filed.  (R. 32.)  At the first step, the ALJ found that R.G. had not engaged in substantial

gainful activity since the date of her application.  (*Id*.)  The Court does not construe Plaintiff's submissions in connection with this action as challenging this finding.

At the second step, the ALJ made a number of findings.  He found that R.G. suffered from two severe impairments:  attention deficit disorder and a mood disorder.  (*Id*.)  Both of these findings are supported by the biopsychological reports submitted in connection with the application.  (R. 273, 279.)  The ALJ concluded that, although the record contained prescription pad notations indicating that R.G. suffered from obesity and hyperlipidemia, those impairments were not "severe" because there was no medical evidence that either condition resulted in anything more than minimal impact on her ability to function, and she took no medications for those impairments.  (R. 32.)  These findings, too, are supported by the record.  (*See* R. 55-56, 207.)  The ALJ further concluded that, although Plaintiff testified that R.G. suffered from asthma and reduced hearing in one ear, there was no medical evidence in the file to support either of these assertions.  (R. 32.)  Again, neither Plaintiff nor Plaintiff's counsel who appeared with her at the hearing submitted any medical records regarding these impairments and their severity. Thus, the ALJ properly excluded these purported impairments from his analysis.

At the third step, the ALJ concluded that R.G.'s impairments did not meet or medically equal one of the Listings, finding that neither the attention deficit hyperactivity disorder nor mood disorder resulted in marked impairments.  (R. 32-33.)  These findings were supported by the substantial evidence in the record as the biopsychologic reports, the only evidence in the record as to these impairments, demonstrate that R.G.'s impairments did not rise to the level of severity required for Listings 112.04 (Mood Disorders) and 112.11 (Attention Deficit Disorder). (R. 268-74, 275-80.)  For example, with respect to Mood Disorders, a claimant must demonstrate that she suffers from at least five of the symptoms of major depressive syndrome (depressed or

irritable mood, markedly diminished interest or pleasure in almost all activities, sleep disturbance, psychomotor agitation or retardation, fatigue or loss of energy, feelings of worthlessness or guilt, difficulty thinking or concentration, suicidal thoughts or acts, or hallucinations, delusions, or paranoid thinking) or three of the symptoms of manic syndrome (increased activity or psychomotor agitation, increased talkativeness, flight of ideas or subjectively experienced racing thoughts, inflated self-esteem or grandiosity, decreased need for sleep, or easy distractibility). *See* Listing 112.04(A). With respect to major depressive syndrome, the biopsychological reports support a finding of difficulty thinking or concentrating and perhaps, irritable mood, but none of the other factors. (R. 271, 278.) With respect to manic syndrome, the biopsychological reports support a finding of easy distractibility and perhaps flight of ideas, but none of the other factors. (*Id*.) Likewise, the record does not support a finding that R.G.'s attention deficit disorder medically equaled the criteria found in Listing 112.11. (*Compare* Listing 112.11 *with* R. 271, 278.)

The ALJ's conclusions as to the severity of these two impairments are further supported by Dr. McWilliams, the state agency review psychologist. (R. 415-21.) She diagnosed R.G. with a "Learning Disorder" not otherwise specified, of mild to moderate severity. (R. 416.) The ALJ gave "significant probative weight" because Dr. McWilliams' opinion was consistent with the record and notably, Mr. Slawinski did not opine as to the severity of R.G.'s impairments. (R. 36.) The ALJ was entitled to rely on Dr. McWilliams' opinion as it is acceptable to assign such weight to the opinion of a medical expert who has reviewed all of the medical evidence and issued an opinion consistent with the substantial evidence. *See Diaz v. Shalala*, 59 F. 3d 307, 313 n.5 (2d Cir. 1995) (explaining that the regulations allow, among other things, "the opinions of nonexamining sources to override treating sources' opinions provided they are supported by

evidence in the record"); *Oliphant v. Astrue*, 2012 WL 3541820, at *15 (E.D.N.Y. Aug. 14, 2012) ("[Under the Regulations, opinions of non-treating and non-examining doctors can override those of treating doctors as long as they are supported by evidence in the record.") (citing *Schisler v. Sullivan*, 3 F. 3d 563, 568 (2d Cir. 1993)).

Additionally, the ALJ concluded that R.G.'s impairments did not functionally equal the listed impairments. (R. 33-41.) In reaching this conclusion, the ALJ reviewed the testimonial and self-reported evidence in the record (R. 33-36) and evaluated R.G.'s abilities with respect to the six functional equivalence domains (R. 36-41). The ALJ found that Plaintiff had: less than marked limitation in acquiring and using information (R. 37); less than marked limitation in attending and completing tasks (R. 38); less than marked limitation in interacting and relating with others (R. 39); no limitation in moving about and manipulating objects (R. 40); less than marked limitation in the ability to care for herself (R. 41); and no limitation in health and physical well-being (R. 41).

Each of these findings is supported by substantial evidence in the record. First, due to the limited medical evidence found in the record regarding the severity of R.G.'s impairments, the ALJ was required to evaluate the intensity, persistence, and limiting effects of R.G.'s symptoms as reported by Plaintiff. The ALJ accurately pointed to several instances in which Plaintiff's testimony concerning R.G.'s symptoms was contradicted by Plaintiff, R.G. or various employees of 10th & Penn and Antietam. (R. 34.) Second, the ALJ reviewed the assessments of 10th & Penn and Antietam as well as the biopsychological reports. (R.34-36.) The ALJ accurately summarized the findings contained in those reports, which, as he noted, do not support a finding that R.G.'s impairments functionally equaled the impairments in the Listings. Finally, the ALJ evaluated the criteria for each of the domains and referred to various portions of the record that

address those criteria. (R. 36-41.) The Court has reviewed each of his findings as well as the records cited in support of his findings, all of which was supported by substantial evidence in the record. Accordingly, the ALJ properly determined that R.G. was not disabled within the meaning of the Act.

## CONCLUSION

For the reasons set forth above, the Commissioner's motion is granted and this action is dismissed in its entirety.

SO ORDERED.

Dated: Brooklyn, New York
      March 27, 2014

                              /s/
                            DORA L. IRIZARRY
                    United States District Judge